Good morning, your honors. Good morning. My name is Clayton Kraken. I represent the appellant Elizabeth Cerda in a case against her former employer, Blue Cube Operations, Inc., out of Freeport, Texas. Ms. Cerda worked for Blue Cube for quite an extensive period of time, perhaps a decade or so, and near the end of her job there, her father suffered a serious health condition. He had a stroke. He had a hemorrhage. He had a lot of very significant things that resulted in a lot of help and needs that he had to, excuse me, needs to get help from other people. And this ultimately fell to his daughter, one of his daughters, because the other siblings lived elsewhere. And Ms. Cerda had communicated to her supervisor what was going on with her father, the things that she needed to do, which included giving him medicine, making sure he took his, ate his food, making sure that he was able to use the bathroom and care for himself and, you know, do things that normal people can do on their own without assistance. And her supervisor was aware of this, and he submitted an affidavit submitting those facts and stating that he was aware that she would miss work at lunchtime and that she would miss work during other normal working business hours to go and care for her father. Even though that was happening, she was never offered any type of FMLA leave, and nobody ever raised FMLA leave with her. Blue Cube had filed a motion for summary judgment, and the trial court granted it, finding that Blue Cube Operations was not on notice of Ms. Cerda's father's serious health condition. And in this case, that's the critical issue, at least in my mind, that caused the trial court to error in granting summary judgment in favor of Blue Cube and also caused the court to deny Cerda's cross-motion for summary judgment. Because in the Fifth Circuit, there's two types of ways that an employee can get to their entitlement of FMLA leave. One is where they just request, you know, may I have FMLA leave, and the other is where they impart sufficient knowledge and information to the employer so that the employer makes an inquiry as to what the condition is and whether or not FMLA applies. Are there any specific record sites you can point us to that show that your client expressly requested leave? Are there any of those in the record? Your Honor, they're— Not just sort of the possibility that I might have to request leave, not discussing the possibility of needing leave, but a specific express request? Yes, Your Honor. There are, if we look at ROA 23-404-218 to 219, in her deposition, she testifies, oh yeah, he was like, go take care of your dad, do what you got to do, and then I would leave or use vacation or whatever. And the OP lady would, if I had like, say, leave for an emergency or something happened or whatever, in some situation or leave early, you know, he would say, yeah, go ahead and take care of him. He was very understanding. That's her quote. That's, yeah, the way she recited it. But this is, okay, so she's kind of recounting an earlier conversation, right? She is. Well, so this was a continuing— But is there anything in the record that memorializes, documents, substantiates an express request? Yes, Your Honor. There's that and there's also ROA 23-404-404.908-909. And in that, that's the affidavit of her supervisor, Mr. Gibbons. And if we look here, he says, I was aware that Serta would frequently visit him during lunch and other times during work to care for him and that he was responsible, that she was responsible for taking care, taking him to his doctor's appointments and, you know, feeding him and bathing him and clothing him and making sure he got his medicine and did all these things. And it would be an impossibility for—it would be like an employee saying, hey, I've been in a car crash. I can't come to work for a month, right? And then the employee shows up to work a month later and the employer says, well, you never requested leave. Well, it's not like that at all, really. I mean, what she told Gibbons was, I'm going to go by and check on him every lunch during my lunch break. And during normal business hours. Well, I mean, let's put emergencies aside because emergencies come up. I don't know that that's tantamount to giving the employer notice of FMLA leave eligibility or request. In other words, I don't think she ever told Gibbons and I don't think Gibbons said, well, you know, she told me she was going to take a couple hours for lunch instead of 30 minutes. She said she was going to run by and check on him. How is that notice to the employer that she wanted FMLA leave given that especially she had taken leave before? Right. So, the issue isn't whether or not they have noticed that the employee is requesting technically FMLA leave. The question is, is the employer apprised of the facts that are problem here? And I think she might fall within the protections of the FMLA. Well, but I mean, everybody with an aging parent that they got to go check on or everybody with a kid that needs to be picked up from school or, you know, something happens is not giving the employer knowledge that, well, maybe FMLA leave is an issue here. But I would suggest that this is a little bit different. This isn't picking up a child from school or just dealing with an ordinary aging parent. This is a person who suffered from a function by himself. And he lives by himself. And at some point, he did have a caretaker who helped. And then the caretaker was gone. And they knew this. And this is what's interesting about this, is this isn't a ordinary relationship between Steven Gibbons and Elizabeth Serta. They're actually close friends. And he has intimate knowledge of what she's doing. And they've worked together for years. And he testified, I was never trained on the FMLA. I didn't know. Well, not in HR. He's not in HR. Referred her to HR. He did about- Didn't go to HR. She did go to HR. In fact- She's not to request leave. No, she- In this instance, where is it in the record she went to HR after Gibbons suggested she do so? Your Honor, it's later, right before she's terminated. Let me see if I can find it. She goes to Mulligan and she asked Mulligan about FMLA. And Mulligan says, oh, you know, we'll talk about it later. He leaves. And yes, it's in there. I don't have the site right here in front of me right now. But yes, that's in my papers and it's submitted to the court. And Mulligan doesn't do anything. And that's the other important part about this is the FMLA. It's not just something where we look at it from that point looking forward. It has a stopgap provision. So if an employee, for example, is taking leave to go do something such as caring for their ailing father and the employer then comes to them and says, hey, what the heck are you doing? And then they explain to you, hey, look, my dad's got dementia. He's had a hemorrhage. He can't function. He's had a stroke. I've got to care for him. I've got to feed him. I've got to give him medicine. I have to do all these things. There's a stopgap provision in the FMLA that says the employer must evaluate that and determine whether the past supposed absences or extended lunches are protected by the FMLA. But Mulligan never does that. She never, you know, evaluates it or thinks about it or does anything concerning her request about FMLA. And Stephen Gibbons, for his part, because obviously he submitted an affidavit in support of Elizabeth Cerda, his testimony was, I had no idea that I was supposed to do that. Nobody had ever trained me on it. And then sometime later when things start kind of boiling over, if you will, that's when I sent her to Mulligan and that's when Cerda testified, yeah, with the Mulligan. And she actually used the word FMLA. And Mulligan just doesn't respond to it and doesn't do anything, you know, with her requests. And what should have happened is from the get go, Gibbons should have referred her to human resources to evaluate whether or not she was entitled to FMLA leave to care for her father. But he didn't. The time she started doing this, she wasn't eligible, was she? No, there was a time that she was not eligible. There was a time that she wasn't. But she'd already used all her FMLA. She used it in 2017, I believe is when it was. That was for a prior shoulder injury. It wasn't until, I believe Gibbons testified, let me see, it was in 20, yeah, he said from at least 2018 until her termination in 2020, I was aware of Cerda's father, you know, his serious health conditions and he recounts what those are. So, no, she was eligible for FMLA at the time, at the relevant time period. And Judge Edison, he didn't make a ruling that she wasn't eligible for FMLA. His ruling was solely focused on, hey, she didn't request FMLA leave. And to reach that conclusion, he looked at the Lanier v. University of Texas case where in there it says that the employee had made a request for FMLA leave, but didn't provide the employer with sufficient information for the employer to determine whether or not FMLA applied. The problem with that case is that it's distinguishable on the facts because the employee actually, right, there's no dispute that the employee said, hey, I need to have leave. And so, the court's analysis was focused on whether or not that actual request imparted sufficient notice. But that's a different path to getting FMLA leave compared to inquiry notice, which is regardless of whether the employee requested leave or not, did the employee impart sufficient knowledge so that the employer should have realized, hey, this might be an FMLA qualifying event that we need to follow up and, you know, ask additional questions and determine whether or not, you know, FMLA leave applies to her. But Blue Cube didn't do that. And Cerda, excuse me, Mulligan, for her part, and this is cited in our papers, when she was asked during her deposition what an employee needs to do, she didn't say that they need to request leave. She said they need to inform us and provide us enough information so that we can determine whether or not they're entitled to FMLA leave. And that's the whole point of this is that employees don't know. This is a plant worker in Freeport, Texas. She doesn't know that she's got FMLA right now. She's done it before. For herself, not for her father. That's the thing. That's the distinction. She testified at her deposition that she had no idea that she could use it for her father. She testified that she understood she could use it for herself. But she knew the procedures for providing notice. She knew the procedures for requesting FMLA leave for herself and for her children. But what she didn't know is that her father falls within the protections of the FMLA. Nobody told her that. And she's not a sophisticated person. She's a plant worker. She doesn't know what her FMLA rights. And if you look at the materials and the testimony from Michelle Mulligan, there'd be no way for her to know that because Gibbons isn't, the supervisor of Gibbons, he's not trained on it. Elizabeth Serra is not trained on it. Nobody told her. He told her to go to HR and talk about it. But that was. She didn't do it. That was after people had come. No, she did do it. She testified that she spoke to Michelle Mulligan and specifically mentioned FMLA leave. It's in the papers inside it. When exactly? It was, I want to say it was maybe two weeks, four weeks or so. It wasn't immediately before her termination, but it wasn't a super long period. How long had she been going at that point to check on her father's lunch at her lunch break? Since 2018. So basically, she finally went to HR about two to four weeks before she got terminated, even though I think Gibbons had suggested it from the get go, right? No, he didn't. That's the thing here is Gibbons tells her and he has it in his affidavit. He tells her, yeah, go do what you need to do. And so she does. And she's not in any sort of trouble. And then you fast forward several years, an employee says, hey, she took a one hour lunch. And then they launch an investigation to figure out whether or not she was taking one hour lunches. And that's when this thing, the whole situation started to boil over. They said, well, hold on. You're taking one hour lunches. And then that's when Gibbons said, well, you need to go talk to HR about this. And so she does. And she talks to Michelle Mulligan about getting FMLA leave and isn't providing any paperwork. And Blue Cube never evaluates whether or not the stopgap provision should be applied to retroactively protect her leave. I'm sorry. When you say she went to HR, are you referring to her testimony where she said Michelle was coming out of the conference room after a meeting? It was real short. And I said to her, I want to talk about possibly getting FMLA. Yes. Is that what that is? That's the whole evidence regarding her going to HR. I believe that's the whole evidence of her going to HR and specifically requesting FMLA leave. I mean, her and HR had additional conversations. Because if you look at Michelle Mulligan's notes related to the termination, she writes in there in her notes that she's aware of her father, that she's aware that she goes to care for him. It's in the notes and it's submitted in the record. Michelle Mulligan not only had the specific request for FMLA leave, but she also had the requisite knowledge to know that, hey, this might be a serious health condition for her father. And we need to evaluate whether or not the FMLA applies. But as far as your client telling her, she didn't remember telling her at that short period of time right after she's walking out of the conference room. Say that again, I'm sorry. According to your client's testimony, her meeting with this HR person was very short. She doesn't remember whether she told her about her father's condition at that time. But that's the point, though. If you request FMLA leave, then the employer definitely needs to inquire, hey, why do you need FMLA leave, right? So she used the buzzword. If you don't use the buzzword FMLA leave or leave and you just tell them, hey, I was just in a horrific car accident and I can't go to work for three weeks, that employee doesn't have to say, hey, I need FMLA leave. The employer is supposed to be sophisticated enough to say, OK, this sounds like she's got a serious health condition. Isn't there a difference between saying to someone walking out of the room, hey, I need FMLA versus, hey, I want to come talk to you about possibly getting FMLA? No, there's not. Is there a distinction between those two things? Yes, factually. But legally, no, because it imparts the employer sufficient knowledge to recognize that, hey, we need to inquire about why she's needing FMLA leave. And hey, guess what? What I've got in my handwritten notes that she's visiting her father. I think that might be why she's asking me about FMLA leave. It's the employer who's supposed to be sophisticated enough to evaluate the facts and circumstances to make a determination of whether or not they're entitled to FMLA leave. And here they didn't do that. OK, thank you very much. Mr. Nelson, good morning. Good morning, Your Honor. May it please the court. My name is James Nelson, and I represent Blue Cube Operations, the defendant in this case. This court should affirm summary judgment for Blue Cube on each of SIRTA's claims. First, SIRTA cannot prove FMLA interference because she never gave Blue Cube adequate notice of an intention to take FMLA leave. And Blue Cube did not deny any properly requested leave. Second, SIRTA's FMLA retaliation claim fails because she did not engage in protective activity. She was terminated for legitimate, non-retaliatory reasons. And there is no substantial evidence pretext, including because Blue Cube has allowed her to take FMLA leave before, as well as an additional 10 months of leave that the statute does not require. Third, SIRTA's Title VII sex discrimination and retaliation claims fail, also for the lack of pretext. And finally, she does not even argue that her sexual harassment claim meets the applicable standard on appeal. SIRTA's termination resulted from two things in early 2020. First, her supervisor Gibbons reported her to HR that co-workers were complaining that she was skipping work. She was missing shifts while she was on the clock and getting paid. HR manager Michelle Mulligan investigated the matter and found that she had skipped 99 hours of work in just a three-month period, which represents more than $3,000 of pay for work that she did not do. Second, SIRTA's supervisor also reported to Mulligan that several co-workers alleged that she had threatened to give them COVID-19 in March 2020 at the beginning of the pandemic. Eight different co-workers submitted affidavits that she made these threats. Blue Cube's disciplinary panel then terminated her for both of these reasons, time theft or skipping work while on the clock and getting paid, and threatening co-workers. Neither the FMLA nor Title VII permit an employee to do either of these things, so she was rightfully terminated. As a result, all of her claims fail. First, on the FMLA interference claim, that fails because she did not do what every Fifth Circuit case on this issue says she has to do. Notify her employer of her intention to take time off of work for an FMLA qualifying reason. SIRTA admitted in her deposition on at least three occasions that she never asked anyone for time off of work to care for her father. She only told her supervisor that he was sick and that she visited him during her unpaid lunch breaks, when any employee could do whatever they wanted during those 30 minutes. And she only needed to visit him to give him food and medicine, and that the house was five minutes away from work so that she could do it during the 30-minute period. She also admitted that she successfully took FMLA leave before for her own surgery and correctly followed Blue Cube's procedures, which she was aware of. And then again, Your Honors, applied for and got 10 months of unpaid leave from her employer that the statute did not require for almost all of 2018. In contrast, she admittedly did not follow those procedures to request leave here. If SIRTA's conduct were protected by the FMLA, that would create a perverse incentive for employees to not communicate requests for time off clearly to their employers, taking self-help paid breaks instead of FMLA unpaid leave, and then asking to redesignate that leave later. But the FMLA and its regulations make clear that employees must request leave 30 days before they're going to take it, must clearly indicate the timing and duration of the anticipated leave, and must follow the employer's procedures for doing so. SIRTA indisputably did none of those things in this case. SIRTA also admitted that even after her supervisor Gibbons told her to ask HR about her FMLA entitlement, she never requested leave from HR. And one note on the timing, Your Honor. In SIRTA's deposition, she specifically said that she thinks this was in the six-month timeframe when her supervisor told her to check with HR. And all of the evidence of the 99 hours of time theft was during the last three months of her employment. So all of this time theft happened after her HR told her to get with—after her supervisor told her to check with HR, and she never requested leave from HR. She was content to get paid for time that she was not working, instead of asking for unpaid leave. Is the evidence that her supervisor was well aware of her father's health issues and was supportive and accommodating, and encouraged her to go to HR, and the comment to the HR manager sufficient to create a fact issue for the jury to determine whether or not she requested FMLA? So, Your Honor, I agree with what she told her supervisor, but I don't agree that what she told HR is sufficient to create a fact issue. And I would point, Your Honor, to this court's case in Wilson, where an employee went to their supervisor, HR, and said, I'm having a child on the way, and I might need to take FMLA leave, but then never followed up to actually request that leave or say what the timing and duration of the leave would be. And this court clearly held in Wilson that that is not enough to put the employer on notice of a request to take FMLA leave. Here, we have something almost indistinguishable. She went to HR and said, I possibly or might want FMLA, and that's it. What about the supervisor's affidavit that said he was well aware, and he told her to go to HR? Yes, Your Honor. So, that is also not enough to create notice to the employer because it's not a request to take time off to care for her father. And I direct Your Honor to Harrelson and the Greenwell cases, where the employees talked to their supervisors about a medical condition and even got one or two days off from their supervisor, but then never actually followed up with HR to request leave. But what if she didn't know her father was a covered individual? So, Your Honor, the first thing I'd say on that is that it's not relevant. Under the test for FMLA interference, she never points to any case saying that that's relevant. But the other thing I'd point out, Your Honor, is that it's undisputed that Blue Cube did what it had to do under the regulations, which was post an FMLA poster in the work site, and it's in the record on three separate occasions. And it clearly says, for your own health condition, your children's, your spouse, or your parent. And she says she knew that the poster was there, but never sat down and read it. That's at page 81 of her deposition transcript. And at page 75 of her deposition transcript, she says that she knew Blue Cube had an FMLA policy, but never went back to study it and see what it entailed. There's no burden on the employer to make sure that each and every employee understands their FMLA rights. Some other statutes and regulations do require education of employees and things along those lines. There's never been any argument here that there was a burden on the employer before the employee asks for time off. And again, she took FMLA leave before, and if she had any doubt in her mind about whether it covered her father, she could have asked anyone. She could have asked Michelle Mulligan. She could have asked her supervisor. She didn't do it. Her supervisor went out of the way to tell her to ask Michelle Mulligan whether she was covered for her father specifically, again, six months before she was terminated. And instead, she just took time off when she knew she was on the clock and getting paid, and never followed up with Michelle Mulligan. Her FMLA retaliation claim fails for similar reasons because there's no protected activity. But even if there were protected activity, and we get to the pretext section of the burden shifting framework, she has not identified any substantial evidence of pretext in this case. She argues both that there was disparate treatment and that it should just not be believed that she was fired for the two reasons that the HR committee identified. But she hasn't put forward any evidence that she was fired for retaliatory reasons for taking FMLA leave, or for her sex, or for any complaints made about sexual harassment. Indeed, she actually admits in her deposition transcript at pages 288 and 289 that she does not think she was fired for those things. And where a plaintiff does not put forward any evidence that she was fired for illegal reasons, and then expressly disavows those claims in her deposition, that should be enough to put those claims to rest. Finally, on the sexual harassment claim, I'd just like to point out, Your Honors, that on appeal in both of her appellate briefs, she never disputes the district court's holding that the sexual harassment episode that she reported to her employer does not meet the terms of her employment. And even after we pointed that out in our response brief, on reply, she continues to not even mention the applicable standard, and to not argue that she met it. For all these reasons, the court should affirm summary judgment on all service claims. Unless the court has any other questions, I'm happy to get back to the rest of my time. Okay, thank you, Mr. Nelson. Mr. Crickhead, you're back on rebuttal for five minutes. Few things, Your Honor. You had requested a cite for the testimony from Elizabeth Serta. She said, and she was walking out of the conference room, and I told her, oh, by the way, I said, I talked to Gibbons, and he wanted me to talk to you about, I don't even remember the whole And that's at 576-1-9, and if you look at Ms. Mulligan's contemporaneous notes related around the time of her termination, you'll see that she writes in there. She memorializes that she's telling her about her father, that she goes to care for her father. Mulligan knew, and if you look at Mulligan's testimony and Blue Cube's policy, it says, once an employer, this is their policy, once an employer becomes aware that the employees need relief is for a reason that may qualify under the FMLA, the employer must notify the employee if he or she is eligible for FMLA leave, and if eligible, must provide a notice of rights and responsibilities under the FMLA. If the employee is not eligible, the employer must provide a reason for ineligibility, and that's in ROA 497, and that's what's going on here is that Mulligan says all you have to do, and she testifies to this repeatedly in her deposition, that all you have to do is make us aware of the need for FMLA leave, and you do that by informing your supervisor, and once you do that, Blue Cube is then supposed to affirmatively provide you FMLA paperwork, and that's consistent with the statutory or the regulatory framework. It puts the burden on the employer, and I know that they're saying, oh, the burden's not on the employer. It's absolutely on the employer because it's their obligation to educate the employees. Importantly, too, they talk about this poster board. Mulligan herself admitted that the poster board was incorrect. If you were to follow what it asked you to do, you'd be calling a completely wrong company because it was outdated. Mulligan also testified that their FMLA policies weren't available online because they were in the process of harmonizing their computer systems. That was the word she used. They were harmonizing their computer systems after an office move, and those materials were not available. If the HR manager can't tell you how you're going to get the FMLA paperwork, I don't know how you're going to expect that an hourly plant worker in Freeport is going to be sophisticated enough to go and answer all these questions that she might have about FMLA and her eligibility and her entitlement and whether her father had a serious health condition, and when you look at the summary judgment standard, I get it. There might be a factual dispute here. Their argument, a jury may be persuaded by it, but the court, you know, can't make credibility determinations or weigh the evidence and must disregard all evidence favorable to the moving party that the jury is not required to believe, right? If a jury believes that Ms. Serta went to Ms. Mulligan and mentioned FMLA, used the words FMLA leave and told her, hey, I'm going to take care of my father and that Gibbons has intimate knowledge of her father's condition and doesn't share that with Mulligan and never instructs Serta to go to HR, of course a jury can conclude from that that they interfered with her rights under the FMLA, and if the court were to find that she in fact did put, there's a fact issue at a minimum as to whether or not she provided adequate notice, it changes the entire analysis of the court's opinion with respect to not only FMLA interference, but also to FMLA retaliation, because that was the basis on which he said that there wasn't a successful FMLA retaliation claim either. And importantly about pretext, I just want to make a quick aside about this. What the trial court did is it looked at all the evidence of pretext in a vacuum. So, for example, the termination paperwork, the termination paperwork states that Michelle Mulligan did it, that she terminated her, that she submitted it and approved it, but they also submitted an affidavit that stated Cunningham, Sheldon, Fleck were the decision makers. Well, that's a fact issue. The jury doesn't have to agree that Mulligan wasn't the decision maker when the termination paperwork states that she was. They state that she was terminated for theft of time and for making threats, but Mulligan testified in her deposition that she was terminated for theft of time. It had nothing to do with it. Were there issues supposedly with threats? Yes, but Mulligan was unequivocal. She was terminated for theft of time and so was her own supervisor, Stephen Gibbons. And the trial court said, ah, the supervisor doesn't know. That's just a super, of course the supervisor knows why his employee's getting terminated. Gibbons also said that Mulligan conducts sham investigations and the date logs for lunches show that on 223 other times, employees took over a 30 minute lunch and not a single one of them was disciplined. That raises a pretext. Those issues combined, a jury could conclude like, I don't think this is a real policy. I don't think it's real. Thank you, Your Honor. Okay. Thank you very much. Appreciate the helpful arguments from both sides and the cases submitted.